**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **RICHARD L. BURDEN,** | |
| **Plaintiff,** | |
| **v.** | **No. 08-cv-04-DRH** |
| **CSX TRANSPORTATION, INC.,** | |
| **Defendant.** | |

## MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

## I. INTRODUCTION

This matter concerns plaintiff's personal-injury action against defendant, his former employer, under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.* A trial was held beginning on November 1, 2010, and the jury found in favor of plaintiff, assessing damages of $9,000,000 against defendant (Doc. 124).

Now before this Court are multiple motions from both defendant CSX Transportation, Inc., and plaintiff Richard L. Burden. For the following reasons, defendant's motion for judgment as a matter of law or for a new trial (Docs. 143 & 145) is **DENIED**; defendant's motions for leave to supplement and to exceed 5 pages (Docs. 182 & 183) are **GRANTED**; plaintiff's motion to strike (Doc. 190) is

**DENIED**; defendant's motion for extension of time (Doc. 185) is **DENIED** as **MOOT**; defendant's motion for set-off (Doc. 147) is **DENIED**; plaintiff's motion for prejudgment interest (Doc. 136) is **GRANTED** in part and **DENIED** in part; plaintiff's motion for costs (Doc. 138) and motion for reimbursement of additional costs (Doc. 139) are **GRANTED**.

## II. MOTIONS FOR LEAVE TO SUPPLEMENT; TO EXCEED 5 PAGES; TO STRIKE; AND FOR EXTENSION OF TIME

Defendant believes it is entitled to judgment as a matter of law because there was no evidence for the jury to conclude (1) that defendant had notice the ballast where plaintiff fell was dangerous or (2) that the ballast's not meeting specifications caused plaintiff's injuries. Defendant also presents several grounds for new trial: (1) Two jurors failed to disclose material injuries and lawsuits involving themselves and relatives in response to questions posed in voir dire, (2) the jury's conclusion that plaintiff suffered brain damage was against the weight of the evidence, and (3) one of the witnesses, a neuroradiologist, offered opinions beyond the scope of her treatment of plaintiff without providing a report under Federal Rule of Civil Procedure 26(a)(2)(B).

Defendant's reply brief is itself a matter of contention. After plaintiff was given leave by the Court to exceed 20 pages in his response and filed a 61-page brief, defendant requested leave to file a supplemental brief in support of its current motion (Doc. 182) and to exceed 5 pages in a reply (Doc. 183). In the alternative, defendant moved for an extension of time to file a reply that met the 5-page limit (Doc. 185). Plaintiff opposed each request (Doc. 189, 191, 192) and

moved to strike the reply (Doc. 190). He primarily opposes defendant's inclusion of affidavits in the reply brief and quotes Federal Rule of Civil Procedure 59(c): "When a motion for a new trial is based on affidavits, they *must* be filed with the motion" (Doc. 190, p. 6) (plaintiff's emphasis).[1] But that is not the entire rule. It continues, "The court may permit reply affidavits." Fed. R. Civ. P. 59(c). Plaintiff also opposes the affidavits because they were filed so long after the original motion and Rule 6(b)(2) does not allow courts to extend the time to act under Rules 50(b) or 59(b). Defendant did file its motion within the 28 days required by Rules 50(b) and 59(b). There was no extension of time, and Rule 59(c) permits reply affidavits. The lengthy delay was due to plaintiff's own requests for extensions of time to respond (Docs. 164, 171, 173).

Defendant requests leave to file the supplemental brief because it did not anticipate the Court's juror questionnaires—on which much of its motion for new trial depends—being destroyed immediately after trial. The Court credits this explanation and allows the affidavits, which merely attest to the two jurors' answers to the Court's questionnaires. Defendant stated the same information in its original motion. Further, plaintiff himself was permitted to file an extensive response brief and raised some new arguments, such as waiver. Defendant should be permitted to respond. Any arguments first made in a reply brief are waived, however. *Bodenstab v. Co. of Cook*, 569 F.3d 651, 658 (7th Cir. 2009). The Court agrees with plaintiff that the bulk of defendant's reply repeats arguments it made

---

[1] This also forms the basis of one of plaintiff's arguments in his response, namely, that defendant may not object to the jurors because it failed to include affidavits with its motion.

originally. Those parts will not be considered. The Court therefore **GRANTS**
defendant's motions for leave to supplement and to exceed 5 pages (Docs. 182 &
183) and **DENIES** plaintiff's motion to strike (Doc. 190). The motion for an
extension of time is **DENIED** as **MOOT** (Doc. 185).

## III. JUDGMENT AS A MATTER OF LAW

### A. Factual background

Plaintiff Richard Burden was employed as a train conductor for defendant
CSX Transportation, Inc. In August 2007, he was injured while dismounting a
tank car onto some gravel, or "ballast," next to the tracks:

> I had a lantern and I was shining the light down. And
> you look to see the ballast to see if there's anything on
> the ground . . . like brake shoes or holes in the ballast or
> pieces of wood or anything, anything that would be in
> your way that you would step on . . . and it looked good.
> . . . [A]nd then I turned around and I grabbed—I put my
> left hand on that handrail. . . . My right hand [was] down
> here on this hand grip. . . . So I could hold on. . . . Put
> my right foot down here on this [sill]. . . . Then I put my
> left foot in the rung. . . . Otherwise, if you leave your left
> leg up, your left leg is blocking your light. . . . I put my
> left leg down on the ballast, and . . . it felt sturdy, and
> then I took my right leg and I was in motion to take it
> down, and then the ballast gave way underneath my left
> foot. Well, I was looking down, and that unforgiving
> piece of steel that's there ripped my head open, and after
> that I can't tell you anything.

(Doc. 133, 141:17–144:9). Although it felt firm, the ballast "gave way" or
"collapsed" and plaintiff fell.

One of defendant's supervisors, Terminal Manager Gary Turner, worked in
the Evansville terminal when plaintiff was injured. Turner was responsible for the

safe and efficient operations at the terminal. He was also on the safety committee, and said no one had complained to the committee before about the ballast giving way. Internal specifications required the ballast to be piled to the top of the rail ties, extend six inches from the tip of the ties, then slope at a 2:1 ratio to the level portion of the road. Nevertheless, Turner agreed that the ballast was not even with the top of the end of the ties. He admitted that the ballast where plaintiff fell was "not a sufficient amount of ballast as what our standard says," it was "low in that area," and that more would have made it safer (Doc. 140, 30:1–6, 38:9–10). Similarly, Yardmaster Jason Crow said nothing was wrong with the ballast itself other than there not being enough of it (Doc. 129, 200:2–6).

Turner noted that ballast tends to roll or shift and that on inclines, where ballast is at an angle, "it will shift easier than just walking on flat ballast" (Doc. 134, 144:23–45:3). Turner walked up the grade where plaintiff fell and observed that the ballast shifted when being walked on: "when you think of a pile of rocks, when you walk up, they kind of slide down, compact" (*id.*, 148:8–11). He tried reenacting plaintiff's accident and was never able to step down in a safe manner.

Wayne Willoughby was plaintiff's supervisor. His duties included investigating accidents. Willoughby was asked whether anything was unsafe about getting down from the train at the location where plaintiff fell. He answered, "the steepness of the embankment" and called it "unusually steep" (Doc. 181, Ex. 2, 34). The ballast can shift, he agreed. He also acknowledged that defendant's rules required employees to get off where plaintiff did. Plaintiff's counsel asked

Willoughby whether he had ever suggested building up the ballast on the west side of the tracks where plaintiff fell, and he responded that there had been "discussion of problems with the west side road" for years before plaintiff's accident (*id.*, 35:2–35:15).

Supervisor and Field Investigation Manager Kelly Goedde prepared a report about plaintiff's accident. Goedde said at trial there was a "hazard present" where plaintiff fell, namely, "unstable footing" (Doc. 181, Ex. 3, 30–31). The report states that the object or substance causing plaintiff's injury was ballast (Doc. 181, Ex. 4, p. 3).

John Davis was a trainmaster and plaintiff's supervisor. He was familiar with the area where plaintiff fell. He testified that train crews were picked up and dropped off at that location, and that the crews routinely walked across it.

Greg Cook was the engineer on duty when plaintiff fell. He testified that he would not do anything unsafe and that he had gotten on and off equipment where plaintiff fell. He declined to call the area unsafe, saying it was like anyplace else.

Yardmaster Kevin Peyton observed a picture of the accident site and agreed that the ballast at the site of the accident was not safe "at that particular location" (Doc. 129, 184:10–14). He also noted that the railroaders are required to mount and dismount in that area. Later Peyton hedged, not saying expressly that dismounting a car in area was unsafe; rather, he said it depends where you get on and off because "some areas are better than others" (*id.*, 189:5–10). Plaintiff's attorney questioned Peyton:

Q: It's unsafe for the company not to have enough ballast there, isn't it?
A: Correct. That's correct.
. . .
Q: Isn't it unsafe for this company to have bad lights or no lights for their workers?
A: Yes.
Q: And isn't it unsafe for this company to require you and your friends to work in an area that is not safe? Isn't that unsafe?
A: Yes.

(*id.*, 190:25–191:12).

## B. Discussion

In ruling on the renewed motion, the Court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). The Court views the evidence that was available to the jury in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011); *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009). The question is whether in light of the evidence a reasonable jury could have found in favor of the nonmovant. *Sekulovski*, 639 F.3d at 313. In other words, the Court will overturn a jury verdict only if "no rational jury could have found for the [nonmovant] . . . ." *Waite v. Board of Trustees of Ill. Cmty. College Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir.2002)). "This is obviously a difficult standard to meet." *Id.*A jury verdict can be set aside "[o]nly when there is a complete absence of probative

facts to support the conclusion reached . . . ." *Harbin v. Burlington Northern R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). The Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## C. Analysis

Defendant believes negligence was not established because (1) there was no evidence defendant had notice that the ballast where plaintiff fell was dangerous, and therefore plaintiff's injury was not foreseeable; and (2) there was no evidence that the ballast's being out of specification caused plaintiff's injuries. Foreseeability and causation are essential elements of common-law negligence, which applies to FELA claims. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998).

Regarding notice that the ballast was dangerous, defendant points out that there were not any complaints about the ballast to the safety committee and no prior injuries. But defendant's supervisors admitted to knowing about the unsafe condition and that employees were using that area to get on and off equipment. Turner was on the safety committee and knew the ballast did not meet the company's specifications. He said it was low in that area and that more ballast would have made it safer. He could have reported it to the committee himself as could Willoughby, or better yet, the company could have just fixed this problem they long knew something about. According to Willoughby, defendant had been discussing ballast problems where plaintiff fell for years before the accident.

Crews routinely walked across the area, and both Willoughby and Peyton conceded that employees were required to mount and dismount there. Based on those facts and other evidence presented, a reasonable jury could have found that defendant had notice that the ballast was dangerous.

Defendant also suggests there was no evidence that the ballast's being below specifications caused plaintiff's injuries. The fact that the ballast did not meet specifications, however, was but one piece of evidence. Whether the jury made the specific inference suggested by defendant or not, it was entitled to do so. There was abundant evidence both that defendant's supervisors believed the ballast was unsafe and that it did not meet specifications. Turner testified that the ballast would "roll or shift." He admitted there was not a sufficient amount of ballast. It was too low and more would have made it safer. Willoughby agreed it was unsafe and called the spot where plaintiff fell "unusually steep." Defendant's own personal-injury report cited ballast as the cause of injury. Thus in light of the evidence a reasonable jury could easily have found that the condition of the ballast, whether because it failed to meet specifications or otherwise, caused plaintiff's injury. The Court may not weigh the evidence. Defendant's renewed motion for judgment as a matter of law is **DENIED**, and the Court allows judgment on the jury's verdict.

## IV. MOTION FOR NEW TRIAL

Defendant believes its Fifth Amendment right to due process and Seventh Amendment right to trial by jury were denied because two jurors did not disclose

their experiences with severe head, neck, and back injuries sustained at work and the litigation resulting from those injuries. These experiences, defendant asserts, were too similar to issues that arose during this trial for the jurors to have remained impartial and, had they disclosed the experiences, defendant could have challenged the jurors for cause. Defendant moves for a new trial or for discovery and an evidentiary hearing on the jurors' potential dishonesty and bias.

## A. Factual background

Before voir dire, the panel was given a questionnaire to complete. Among the questions were these three:

> Have you or your spouse ever been involved in a lawsuit as a plaintiff Y/N or defendant Y/N?
> Have any other members of your family ever been involved in a lawsuit?
> Have you, your spouse, or other family members been seriously injured or a victim of a crime?

(Doc. 184, Exs. A & B)[1]. Juror Nos. 2 and 9[2] answered "no" to all questions (*id.*).

During voir dire plaintiff's attorney asked: "Anybody have neck surgery or somebody in your family close to you have cervical surgery?" (Doc. 125, 127:1–2). He also asked: "What about headaches? Anyone have disabling headaches or someone in their family?" (Doc. 125, 128:20–21). Panel No. 19 (Juror No. 9) responded that she had debilitating migraines about three times per month. She takes medication, but they often occur at night and it is too late. The headaches

---

[1] Affidavits submitted in reply brief (Doc. 184).

[2] Panel Nos. 2 and 19, respectively.

typically last two to six hours. She tries not to miss work, but had in the past (Doc. 125, 128:20–129:17).

Defendant's attorney asked:

- Panel No. 19 (Juror No. 9) about the migraine headaches and whether they caused her to miss work. She said she used to miss work, but now they're controlled by medication (Doc. 125, 134:15–25).
- Panel No. 20 about her work with brain-injured individuals.
- Whether any panel members were in a union and whether they could be fair to his client. Panel No. 15 said if the evidence came out 50-50, he'd "absolutely" want to see plaintiff, his "union brother," recover.
- Panel No. 12 about her sister's back injury. She believed it would be difficult for her to be fair in this case.
- Panel No. 18 about her husband's back surgery. She answered that he was doing well and has since retired.
- Whether anyone didn't like railroads.

Defendant challenged Panel No. 12 for cause because she had testified she could not be fair in light of her sister's injury. But in her responses, including those to the Court and plaintiff's attorney, it depended who she was talking to. Since her answers about whether she could be fair were equivocal, the Court excused her (Doc. 125, 143:7–144:8). Defendant also challenged Panel No. 15 for cause because he said he would side with a union brother if the evidence were 50-50. He was also excused (*id.*, 144:10–145:3).

Panel No. 16 mentioned during voir dire that her brother-in-law sustained injuries while working for a railroad about twelve years earlier. He had worked for the railroad for about 35 years. His spine was damaged, causing him a lot of pain.

Ultimately he required surgery, which repaired his spine, but he did not return to work. A lawsuit followed (the juror did not say who it was against). The brother-in-law passed away about three years before this trial (Doc. 125, 128:13–19; 139:14–140:14). There was no challenge, and Panel No. 16 became Juror No. 8.

During the trial, plaintiff raised an issue involving Juror No. 12. The Court investigated the matter in a hearing with both counsel and the juror present. He had failed to disclose during voir dire that his sister had suffered brain damage in a car accident ten years before (Doc. 130, 5:1–16). She also broke her leg in the accident and required more than one surgery to repair it. She evidently sued and recovered a settlement. The juror recalled being asked whether any family members had suffered brain damages but mistakenly assumed it meant people who were still living, and his sister had died. After the hearing, defendant's counsel moved to excuse the juror because he had failed to disclose his sister's severe brain injuries, and the questioning was sufficient for him to have responded. Counsel also noted that the juror had failed to respond to the voir dire question about orthopedic surgeries. The Court obliged. Although the Court did not find that the juror had intentionally failed to answer, it found defendant should have had the opportunity to use a peremptory challenge (*id.*, 15:19–16:2).

After the trial and judgment was entered in plaintiff's favor, defendant investigated Juror No. 2, apparently extensively. A paralegal conducted an internet search with Juror No. 2's name as a search term (Doc. 145, Ex. G). She found that in 2004 Juror No. 2 lived with a woman named R.B., according to a

deposition in medical-malpractice lawsuit (Doc. 145, Ex. A, pp. 4–5). In the deposition, R.B. describes Juror No. 2 as her boyfriend and gives their address.[3] She says they have lived at that address together for four and a half years. R.B.'s November 2010 voting record shows that she lives at the same address.[4] Motor-vehicle records dated December 2010 show that Juror No. 2 and R.B. share the titles and registrations to two vehicles (Doc. 145, Ex. C).

R.B. was injured at work and sustained injuries to her neck and back in 2002 (Doc. 145, Ex. D). She filed a workers' compensation claim (Doc. 145, Ex. E). She underwent surgeries on her neck (cervical fusion) and lower back, and later filed a medical-malpractice lawsuit against the neurosurgeon (Doc. 145, Ex. D). The lawsuit was still pending in the Circuit Court of St. Clair County, Illinois, at the time of this trial. She has undergone frequent treatment for pain and a second spinal surgery. As a result, she is still facing unpaid medical bills.

Defendant's post-trial research also brought to light a lawsuit filed by F.G. after she fell and broke her hip and a wrist in a school's gym lobby in 1997 (Doc. 145, Ex. F). The court's opinion mentions that F.G.'s husband is E.G., and according to one of defendant's attorneys, a colleague familiar with the area where Juror No. 2 lives knows that E.G. is the juror's father (Doc. 145, Ex. G, ¶ 9).

A person with Juror No. 2's name filed a workers' compensation claim against his former employer Cerro Copper Products in 1994 (Doc. 145, Exs. G

---

[3] The name and address were redacted in the exhibit.

[4] Again the address was redacted.

&H). The claim was settled in 1995. The Illinois Industrial Commission[5] has since destroyed the files.

Defendant counsel's paralegal also discovered that someone with the same last name as Juror No. 9 had filed a workers' compensation claim with the Illinois Industrial Commission against his employer, Huntco Steel, in 1994. A marriage license in the public records shows that someone with the claimant's name is Juror No. 9's husband. In 1993, a steel coil hit the claimant in the face. It cut his mouth and injured his head and teeth. The claimant testified in a hearing that he has had headaches every three to four days since the accident. The headaches worsened over the years, reaching pain levels of eight to ten (out of ten), and were nearly like migraines. Neurologists testified about the headaches, one finding they were caused by the work injury, the other finding they were not. After seven years of review, the Commission ruled against the claimant. He then appealed to the St. Clair County Circuit Court, which reversed, until the Fifth District Appellate Court reinstated the Commission's decision in December 2000.

**B. Discussion**

The Fifth and Seventh Amendments guarantee due process of law and trial by an impartial jury. *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 514–15 (10th Cir. 1998). Trial courts have wide discretion in deciding a motion for a new trial. *Arreola v. Choudry*, 533 F.3d 601, 605 (7th Cir. 2008) (internal citations omitted). "Due process does not require a new trial every time jurors have been

---

[5] Currently called the Illinois Workers' Compensation Commission.

placed in a potentially compromising situation." *Id.* (citing *Rushen v. Spain*, 464 U.S. 114, 118 (1983)); *accord Smith v. Phillips*, 455 U.S. 209, 217 (1982). Rather, "due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Arreola*, 533 F.3dat 605 (quoting *Oswald v. Bertrand*, 374 F.3d 475, 478 (7th Cir.2004)). Although due process may require a hearing "to determine whether extraneous contacts may have affected a jury's ability to be fair," that does *not* apply to allegations of preexisting juror bias. *Id.* at 606; *accord Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1141 (7th Cir. 1992) (citing *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir.), *cert. denied*, 449 U.S. 1012 (1980)). "In the due process context, the tool for examining an intrinsic influence like juror bias is *voir dire*." *Arreola*, 533 F.3d at 606 (citing *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998)); *accord Artis*, F.2d at 1141; *Duzac*, 622 F.2d at 913 ("The prejudice complained of is alleged to be the product of personal experiences unrelated to this litigation. The proper time to discover such prejudices is when the jury is being selected and peremptory challenges are available . . . .").

In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court set the standard for determining when juror responses during voir dire require a new trial: the moving party must first show that "a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response

would have provided a valid basis for a challenge for cause." 464 U.S. 548, 556

(1984); *accord United States v. Medina*, 430 F.3d 869, 875 (7th Cir. 2005).

## C. Analysis

Plaintiff argues that defendant had the opportunity to question Juror Nos. 2

and 9 during voir dire but only asked limited questions. Therefore, defendant

should not be permitted to object to those jurors now. A review of cases supports

plaintiff's general position. Instances of parties conducting public-records

searches to disqualify the jurors after a verdict have not been found. Nor do the

parties cite any. But the Supreme Court observed in *McDonough Power*

*Equipment*:

> It is not clear . . . whether the information stated in [the]
> affidavit was known to respondents or their counsel at
> the time of the voir dire examination. If it were, of
> course, respondents would be barred from later
> challenging the composition of the jury when they had
> chosen not to interrogate [the juror] further upon
> receiving an answer which they thought to be factually
> incorrect.

464 U.S. 548, 550 n.2 (1984). "[A] trial represents an important investment of

private and social resources, and it ill serves the important end of finality to wipe

the slate clean simply to recreate the peremptory challenge process because

counsel lacked an item of information which objectively he should have obtained

from a juror on *voir dire* examination." *Id.* at 555. With regard to counsel being

barred from later challenging the jury, the Supreme Court cited the Eight Circuit

decision *Johnson v. Hill*, which held that a "failure to object at the time the jury is

empaneled operates as a conclusive waiver if the basis of the objection *is known*

*or might have been known or discovered through the exercise of reasonable diligence . . . .*" 274 F.2d 110, 115–16 (8th Cir. 1960) (emphasis added). Likewise, in this circuit "[t]he law is well established that a party cannot gamble with the possibility of a verdict and thereafter, when the verdict proves unfavorable, raise a question he might have raised before verdict."*Stanczak v. Penn.R.R. Co.*, 174 F.2d 43, 48–49 (7th Cir. 1949).

The Second Circuit has "consistently refused to allow a defendant to investigate jurors merely to conduct a fishing expedition." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotation omitted); *see also Tanner v. United States*, 483 U.S. 107, 120-21 (1987) ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on decisions of laypeople would all be undermined by a barrage of post verdict scrutiny of juror conduct.")).

Plaintiff first argues that defendant is alleging intrinsic bias, and the tool for examining this bias is voir dire. According to plaintiff, defendant did not ask any questions about the subject matters raised in its motion for new trial. For instance, defendant did not ask the panel about lawsuits or serious injuries. Plaintiff believes defendant was not entitled to rely on the juror questionnaires, which did ask about lawsuits and serious injuries. Courts, however, have permitted parties moving for new trial to allege juror dishonesty based on the court's questionnaires. *See, e.g.*, *Arreola*, 533 F.3d at 603; *Medina*, 430 F.3d at 875. Defendant was not required to duplicate the questionnaires.

Plaintiff's other waiver arguments are more persuasive. The Court agrees that questions that were not asked at all, either in the Court's questionnaires or by counsel, were waived. The *McDonough* test is whether a juror failed to answer honestly a material question on voir dire. It follows that if jurors were not asked something at all, they could not have failed to answer honestly. *See United States v. Arocho*, 305 F.3d 627, 634 (7th Cir. 2002), *superseded by statute on other grounds as stated in United States v. Rodriguez-Cardenas*, 362 F.3d 958 (7th Cir.2004) (inability to identify a false response by the challenged juror was "enough to doom [appellants'] argument").Put more directly, "we cannot put upon the jury the duty to respond to questions not posed." *United States v. Kerr*, 778 F.2d 690, 694 (11th Cir. 1985). Here, questions were not posed about girlfriends, boyfriends, household members, or significant others. Consequently, defendant's claims regarding Juror No. 2's girlfriend, R.B., were waived. Nor were questions were posed about workers' compensation claims. Those claims, which concern Juror No. 2 (and R.B.) and Juror No. 9, are also waived.

The most significant issue raised by plaintiff, however, is whether defendant waived its current allegations of juror dishonesty by not raising them during voir dire or the trial. Plaintiff contends that defendant made no efforts to investigate jurors until after the verdict. Meanwhile, plaintiff did raise a juror issue during trial, which allowed the Court to investigate the matter by holding a hearing with both counsel and the juror present. The Court agrees because all the information about Juror Nos. 2 and 9 submitted by defendant was found in public

documents, primarily by internet searches. Consistent with *McDonough*, *Johnson*, and *Stanczak*, the Court finds that defendant waived its present objections because the basis of the objections might have been known or discovered through the exercise of reasonable diligence. Defendant gambled with the possibility of a verdict and now raises questions it might have raised earlier.

This conclusion is consistent with cases in our circuit as well, inasmuch as suspicions about jurors' honesty typically arose during trial or, if afterwards, only by inadvertent discovery. *See United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (newspaper report after trial); *Arreola*, 533 F.3d at 603 (judge permitted an interview with jurors after trial); *United States v. Warner*, 498 F.3d 666, 677 (7th Cir. 2007) (media reports after trial); *Medina*, 430 F.3d at 875 (juror contacted prosecutors after trial); *Arocho*, 305 F.3d at 632 (witness comment made after trial); *McClinton*, 135 F.3d at 1184 (note from juror during trial).

Defendant counters that if the tool for examining juror bias is voir dire, that includes "post-verdict *voir dire*," as the Seventh Circuit at one point referred to the district court's hearing after trial in *Arreola*, 533 F.3d at 606.Therefore defendant believes it is entitled to a hearing. The court's use of the term "post-verdict *voir dire*" in *Arreola* appears to have been an expression based on how the district judge collected proposed questions from counsel and then questioned the juror in a similar manner to voir dire. Only prejudicial *extraneous* contacts require a hearing. *Id.*; *McClinton*, 135 F.3d at 1186. In *Arreola*, the juror's prior

experience "constitute[d] an intrinsic influence that [did] not require an evidentiary hearing . . . ." 533 F.3d at 606.

The rest of the *Arreola* decision is even less favorable to defendant's argument. The plaintiff's case was based on his ankle injury, and the juror at issue had not only suffered a bad ankle sprain herself, a second juror disclosed that the jury had given weight to the first juror's experience during deliberations. *Id.* at 603–04. In denying the plaintiff's motion for an evidentiary hearing or a new trial, the court reasoned that "jurors are expected to bring . . . their experiences to bear in arriving at their verdict." *Id.* Accordingly, here, the fact that Juror Nos. 2 and 9 might have had experiences similar to plaintiff's does not *ipso facto* make the jurors biased.

Finally, in *Arreola*, the district judge had permitted the parties' attorneys to interview jurors after the verdict, and during that interview information came out about the ankle injury, leading to the plaintiff's motion for a new trial. *Id.* at 603. Unlike this case, the plaintiff there did not conduct a search of public records that he could have done during voir dire or during trial.

The Court finds that defendant's motion for a new trial based on juror dishonesty must be dismissed because the basis of defendant's objections might have been known or discovered through the exercise of reasonable diligence. The Court also concludes, however, that defendant has not shown that a juror failed to answer honestly a material question on voir dire or that a correct response would have provided a valid basis for a challenge for cause.

Moreover, the Court must note relative to the issue of waiver, that counsel was not under a limitation of time or subject matter by the Court during voir dire. Unlike some courts where the judge conducts all voir dire in the interest of judicial economy, the custom in the court where this case was tried, this trial being no exception, is to allow counsel to conduct voir dire following the Court's inquiry. Counsel for the defendant could not with integrity claim to have had insufficient time to explore the subjects at issue here.

Defendant claims that R.B. and Juror No. 2 have been living together as a couple with jointly owned property for over ten years. Therefore, defendant asserts that Juror No. 2 and R.B. are family, "a group of individuals living under one roof and usually one head."[6] It isn't spelled out, but defendant presumably argues that Juror No. 2 was dishonest in not replying "yes" to the juror questionnaire, which asked "Have you *or your spouse* ever been involved in a lawsuit as plaintiff Y/N or defendant Y/N?" and "Have any other members *of your family* ever been involved in a lawsuit?" (emphasis added); and in not responding when plaintiff's attorney asked, "Anybody have neck surgery or somebody *in your family close to you* have cervical surgery?" (emphasis added).

Under the first element of *McDonough*, the movant must demonstrate that a juror failed to answer honestly a material question on voir dire. As to the first question, the Court finds there is not credible evidence that R.B. is a spouse. Defendant infers from public records that R.B. and Juror No. 2 have lived and

---

[6] THE MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/ family.

jointly owned property together for over ten years. But common-law marriage is not recognized in Illinois, *In re the Matter of Harg*, 458 N.E.2d 1154, 1156 (Ill. App. 1983), so they are not legally married. And there is no evidence otherwise that they are married. As to the questions about someone in the family having been involved in a lawsuit or having had cervical surgery, the Court again does not find that Juror No. 2 was dishonest. Defendant cites a definition of the term "family," which plaintiff disputes. Dictionary definitions are not the proper standard for this inquiry, however. As the Supreme Court has explained, "jurors are not necessarily experts in English usage." *McDonough*, 464 U.S. at 555. Juror No. 2 may have considered "family" to mean only blood relatives, not anyone living under one roof. Jurors are often given leeway in how they interpret venire questions. *See, e.g.*, *Arreola*, 533 F.3d at 608 (deference given to juror's understanding of what was meant by a "severe" ankle injury); *Medina*, 430 F.3d at 878–79 (juror may have assumed that "membership in a group" meant a formal group with formal membership rather than people working together); *Artis*, 967 F.2d at 1142 (only a misunderstanding when juror failed to mention his participation in labor arbitrations and administrative proceedings in response to question about "legal proceedings").

Defendant also suggests Juror No. 2 was dishonest in not disclosing the lawsuit filed by F.G., purportedly his mother. He had answered "no" to the juror questionnaire, which asked whether anyone in the family had ever been involved in a lawsuit. It is speculative, first of all, to say this is his mother. According to

defendant's affidavit, a colleague knows E.G. to be Juror No. 2's father. Shouldn't this colleague know the mother as well? In any event, while it is possible Juror No. 2 was dishonest, it is far more likely that he simply forgot the incident. F.G. fell in 1995, about 15 years before this trial; the appellate decision issued in 1999, about 11 years before. Moreover, these facts would not have provided a valid basis for a challenge for cause. F.G.'s lawsuit involved a slip-and-fall in a school gymnasium, not a work or railroad accident causing permanent brain damage. And defendant did not challenge Panel No. 16 (Juror No. 8) even though her brother-in-law injured his spine while working for a railroad 12 years before this trial. His injury was painful, required surgery, and ended his career. There was a lawsuit as well. Thus the Court does not believe defendant would have challenged Juror No. 2 had defendant known about F.G.'s lawsuit.

Defendant next alleges that Juror No. 2 was dishonest for not answering "yes" to the juror questionnaire asking whether anyone had been involved in a lawsuit. Defendant's research shows that Juror No. 2 filed a workers' compensation claim in 1994. Juror No. 2 was not dishonest, though, since workers' compensation claims are not lawsuits. Workers' compensation is a statutory remedy, and the Illinois Workers' Compensation Commission is an administrative agency without general or common-law powers. *Interstate Scaffolding, Inc. v. Illinois Workers' Comp. Comm'n*, 923 N.E.2d 266, 273 (Ill. 2010).As stated above, no questions were posed about workers'compensation claims or administrative proceedings. The same reasoning applies to Juror No. 9,

whose husband filed a workers' compensation claim in 1993. He appealed through state court, but the proceeding remained a review of the workers' compensation claim. Even if it were in a technical sense a lawsuit, that is a far cry from the juror being dishonest. *See Artis*, 967 F.2d at 1141–42 (juror had probably interpreted "legal proceedings" to mean ordinary litigation, not administrative proceedings or labor arbitrations).

Defendant accuses Juror No. 9 of lying because her husband has had chronic headaches since an on-the-job injury in 1993. She did not bring up her husband in response to plaintiff's compound question asking whether the panelists or someone in their family has disabling headaches. In response to that question, however, Juror No. 9 brought up her own migraine headaches. She said they're debilitating and that she has them several times each month. Defendant's counsel later asked her whether the headaches caused her to miss work and how she keeps them under control. He did not pursue the other part of the question, whether someone in her family also had headaches. Thus Juror No. 9 came forward with a candid response. Given the way the question was asked, there is no evidence she was dishonest. Defendant did not follow up.

On the same facts, defendant believes Juror No. 9 should have answered "yes" to the juror questionnaire asking whether anyone or their spouse had been seriously injured. Her husband was hit in the face with a steel coil in 1993. Plaintiff responds that a laceration to the mouth and two damaged teeth 16 years earlier is not a serious injury. And the Commission found that the husband's

chronic headaches were not caused by the 1993 accident. Yet the original question is problematic because what amounts to a serious injury is subjective. The Court cannot say on the facts alleged that Juror No. 9 was dishonest. She may not have regarded the injury as serious. *See, e.g.*, *Arreola*, 533 F.3d at 608 (deference given to juror's judgment on what was meant by a "severe" ankle injury); *McDonough*, 464 U.S. at 555 (noting varied responses to voir dire question that asked about injuries resulting in disability or "prolonged pain or suffering"). Nor does the Court find that an affirmative answer would have provided a valid basis for a challenge for cause, given how long ago this happened. The evidence of impartiality is not there. "It ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough*, 464 U.S. at 555. Again the Court is not persuaded that defendant would have brought a challenge had it known of the 1993 injury. Defendant declined to challenge Juror No. 9 (Panel No. 19) herself, even though she described her migraines as debilitating, and declined to challenge Juror No. 8 (Panel No. 16), whose brother-in-law was injured while working for a railroad.

Finally, defendant asserts that R.B. and F.G. were represented by Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., and that an attorney from that firm, Bruce Cook, might have been used by plaintiff to read records into evidence at trial. Defendant claims this would have been a valid basis to challenge Juror

No. 2 for cause. But Cook never appeared in this trial. Defendant's argument is without merit.

In the event the Court finds that the jurors were not dishonest, defendant moves for a new trial on the ground that Juror Nos. 2 and 9 were impliedly biased because they lived through experiences similar to plaintiff's.

The Seventh Circuit has found implied or presumed bias where a juror experienced a situation similar to the one at issue in the trial. *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992). But *Hunley* involved "unusual and compelling circumstances." *United States v. Medina*, 430 F.3d 869, 878 (7th Cir. 2005); *accord Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1371 (Fed. Cir. 2004) (applying Seventh Circuit law) (doctrine of implied bias calls for "extraordinary circumstances"). Specifically, in *Hunley* four members of the jury were burglarized while sequestered for deliberations; the burglary was strikingly similar to the case in which the jurors were sitting, which put the jury "directly in the victim's situation before she was murdered"; it was a close case anyway; after the burglary, two of the robbed jurors changed their votes to guilty; and all 12 jurors were informed of the burglary. *Hunley*, 975 F.2d at 320. Thus the "implied bias test should rarely apply." *Medina*, 430 F.3d at 878 (quoting *Hunley*, 975 F.2d at 320).

Courts may presume bias if a juror has a "personal connection to the parties or circumstances." *Caterpillar*, 387 F.3d at 1371. The Tenth Circuit explained that such situations include "a revelation that the juror is an actual

employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 517 (10th Cir. 1998) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)); *see also United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) (implied bias may be found if a juror is related to one of the parties or if the juror "has even a tiny financial interest in the case").

Defendant argues that Juror Nos. 2 and 9 had experiences similar to the plaintiff's. R.B. had cervical-fusion surgery, significant lower-back injuries, and chronic pain, like plaintiff. According to defendant, R.B. had surgery on her back in August 2010, and plaintiff said he would need surgery on his back at some point in the future. Defendant also claims Juror No. 9's husband was in a situation mirroring plaintiff's. He suffered an injury to his head and had gradually worsening headaches. The husband's workers' compensation claim and plaintiff's lawsuit involved conflicting testimony from neurologists.

Defendant relies on the Tenth Circuit case *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) and the Ninth Circuit case *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979). In *Burton*, one of the jurors was in an abusive family situation at the time of trial, and the defendant in that trial argued battered-wife syndrome as a defense. 948 at 1159. In *Eubanks*, a juror's two sons were in

prison at the time of the trial for crimes committed while trying to obtain heroin, and the defendants were on trial for heroin trafficking. 591 F.2d at 516.

*Burton* and *Eubanks* are both readily distinguished from the facts alleged here. The Seventh Circuit pointed out that both cases involved crimes "very closely related to the ones at issue in the trial in which the jurors were sitting." *Medina*, 430 F.3d at 878. The same is true of *Hunley*. Here of course we do not have a criminal case at all. Further, *Burton* and *Hunley* involved the jurors themselves having personal connections to the circumstances. Here defendant is asserting only that third persons, a significant other and a husband, have a connection. *Eubanks* involved third persons, the juror's two sons, but they were in prison. Being in a lawsuit or having had similar injuries does not remotely compare with one's sons being in prison for crimes related to the ones at issue in the trial. And since *Eubanks* was decided, the Ninth Circuit has clarified that the juror there "had not been forthcoming about his sons' involvement with heroin." *Fields v. Brown*, 431 F.3d 1186, 1197 (9th Cir. 2005). The jurors here were not dishonest. *Burton*, *Eubanks*, and *Hunley* all involved jurors' situations which took place during the trial or during deliberations. Here, the accidents affecting both R.B. and the husband occurred long ago, in 2002 and 1993. Only R.B.'s lawsuit and a surgery took place recently. All in all, these do not amount to unusual and compelling circumstances.

Lastly, defendant believes the situations with Juror Nos. 2 and 9 present more similarities to plaintiff than Juror No. 12, who was dismissed for cause.

Juror No. 12 had failed to reveal his sister's traumatic brain injury during voir dire. The Court disagrees with defendant's comparison between the situations. Suffice it to say, the implied-bias test does not depend on comparisons with previous jurors who have been excused.

Accordingly, the Court does not find implied bias as to Juror Nos. 2 and 9. Implied bias should only rarely apply, and the circumstances here are not as significant or as timely as the ones in the case law.

## V. MOTION FOR A NEW TRIAL BASED ON WEIGHT OF EVIDENCE AND BENZINGER'S TESTIMONY

Defendant claims that the jury's conclusion that plaintiff suffered a brain injury justifies a new trial under Federal Rule of Civil Procedure 59 because it was against the weight of evidence.

### A. Background

Dr. Walter Lemann is a physician in private practice who specializes in neurology. According to Lemann, symptoms of brain damage can include confusion, difficulty focusing, difficulty completing tasks, headaches, problems managing kids, and forgetfulness. Lemann testified that symptoms of brain injury from head trauma would manifest themselves immediately and not get worse over time. Lemann conducted mental-status testing on plaintiff and found "he appeared confused but it was variable" (Doc. 134, 38:7–8). At times plaintiff could not answer any questions. Other times he gave "pretty clear descriptions" what had happened to him (*id.*, 38:8–11). Lemann said plaintiff was oriented. "He knew who he was but basically was unable to say when it was, year, month, date, day of

the week, or where he was . . ." (*id.*, 38:13–15). Plaintiff cried during the exam while being asked questions.

Lemann said the most important thing for determining whether plaintiff suffered brain injury were the MRI results and plaintiff's own recollection of his history. He called MRI films a "very, very important piece of evidence" (Doc. 134, 41:24–42:2) and said, "If there's been actual brain damage, certainly it shows up on definitive imaging" (*id.*, 40:23–24). He admitted, however, that he had not reviewed any current medical research on the correlation between MRIs and discovering brain damage. He also stated that the contemporaneous emergency-room records, which noted among other things that plaintiff did not lose consciousness, indicated there was not a concern about a head injury of any significance. Ultimately, Lemann concluded that plaintiff had not suffered brain damage caused by his fall in August 2007.

Records from the emergency medical technicians ("EMTs") and the emergency room show plaintiff did not lose consciousness after his injury and had the highest scores on the Glasgow coma scale (Doc. 134, 120:24–121:19). The emergency-room physician on the night of the accident, Dr. Cannon, testified that plaintiff did not exhibit cognitive deficits and seemed alert and oriented. His CT scan was normal.

Plaintiff was referred to Dr. Keith Garcia by a treating physician. Garcia's clinical work includes the diagnosis of traumatic brain injuries. He diagnosed plaintiff with moderate brain injury caused by the fall in August 2007 (Doc. 181,

Ex. 7, 24:23–25:12; 28:12–28:16). Garcia did not review the EMT, emergency-room, or nursing records from the night of the injury. He admitted that understanding plaintiff's mental status at the time of the injury was important to render a conclusion and that having such records would have an effect on a forensic diagnosis. If allowed to see the bulk of the records, Garcia said he might revise his opinion. Garcia testified that there is no guarantee that a brain injury will show up on a CAT scan or MRI because those cannot detect functional injuries (Doc. 181, Ex. 7, 9:20–10:5).

Dr. Nelson G. Escobar is a neurosurgeon and the medical director of the Traumatic Brain Injury Rehabilitation Unit at Marianjoy Rehabilitation Hospital. Escobar concluded that plaintiff had "traumatic brain injury with residual neurocognitive deficits and neurobehavioral deficits" (Doc. 181, Ex. 9, 38:3–6). He did not know whether plaintiff lost consciousness at the time of the accident and agreed that the length of time a person is unconscious correlates with the severity of the brain injury. He testified that 75–80% of patients with neurocognitive problems do not show abnormal MRIs. They do not correlate.

Dr. Brick Johnstone is a practicing neuropsychologist, which means he specializes in treating those with brain injuries and diseases. Johnstone said that one can "absolutely" see normal CAT scans and MRIs in patients who have brain damage (Doc. 181, Ex. 8, 21:20–22). He diagnosed plaintiff with a cognitive disorder caused by a traumatic brain injury; specifically, caused by plaintiff's injury in 2007 (*id.*, 51:18–52:16).

Dr. Tammie Benzinger is a neuroradiologist, a specialist in the imaging of the nervous system. Plaintiff was referred to her, and she conducted and interpreted his MRI results. Her report on the MRI stated there was no evidence of traumatic brain injury (Doc. 181, Ex. E). On direct examination, she testified that in her clinical practice, where they see more positive scans in general, about 80% of the patients with brain damage appear normal on the MRI results (Doc. 131, 27–28). Other than large hemorrhages, there is very little correlation between MRI results and the severity of the injury.

**B. Discussion & Analysis**

Defendant argues that the testimony of psychiatrists Keith Garcia and Edwin Wolfram, who concluded the plaintiff suffered brain damage due to traumatic brain injury, "pales in weight and persuasiveness" to the testimony of neurologist Dr. Walter Lemann. While Lemann used objective tests, Garcia and other physicians relied only on plaintiff's self-reported symptoms. Defendant maintains that the fundamental bases of Lemann's opinion are sound, since plaintiff only refuted the weight Lemann put on the MRI results.

A motion for a new trial may be granted "[o]nly when a verdict is contrary to the manifest weight of the evidence . . . ." *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 876–77 (7th Cir. 2011) (quoting *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000)). Inconsistencies in witnesses' testimony allow the jury "to parse the facts, to weigh the credibility of each witness and to disregard the

testimony it [finds] less credible or incredible." *Robinson v. Burlington N. R.R. Co.*, 131 F.3d 648, 656 (7th Cir. 1997).

The Court finds the jury's conclusion that plaintiff suffered traumatic brain damage is not contrary to the manifest weight of the evidence. Defendant's motion is asking the Court pick and choose which evidence the medical experts should have used to make their diagnoses. For instance, they should have used "objective tests" rather than subjective self-reported symptoms. Or they should have used the emergency-room records. That is not the Court's role. Lemann testified that plaintiff had not suffered traumatic brain injury. Three other witnesses, all medical experts, diagnosed plaintiff with traumatic brain injury. The inconsistent testimony allowed the jury to weigh the credibility of each witness and disregard testimony it found less credible. Several experts explained why MRI results are not reliable indicators of brain damage, contradicting Lemann, who admitted that he had not actually reviewed the medical research on the correlation between MRIs and brain damage. Likewise, there was a very thorough cross examination of Dr. Lemann that the jury may have found very persuasive. There was plenty of evidence of brain damage and the jury was entitled to believe it. Defendant's motion for a new trial under Rule 59 is **DENIED**.

Defendant also claims that plaintiff's witness Benzinger gave testimony beyond the scope of her MRI report to contradict defendant's witness Lemann, and that plaintiff did not disclose the testimony in accordance with Federal Rule

of Civil Procedure 26(a)(2)(B). As a consequence, defendant believes it was prejudiced and that a new trial is warranted.

Before Benzinger took the stand, defendant moved to bar her from testifying about the correlation between traumatic brain injuries and their appearance in an MRI (Doc. 125, 39:11–51:8). As stated above, plaintiff had not disclosed Benzinger as an expert. But the Court concluded that Benzinger's proposed testimony was to explain the meaning of her report and was therefore in the course of her treatment of plaintiff. The Court asked defendant's counsel, "As a radiologist she has a certain body of knowledge. She couldn't be expected to put the entire body of knowledge in her report?" Counsel agreed and said they have nothing additional on that issue (*id.*, 50:18–23). The Court denied the motion but added that if Benzinger is asked for an opinion beyond the scope of her role as part of the treating team, that would be objectionable (*e.g.*, what caused the brain damage). Defendant did not object to Benzinger's testimony at trial. On cross-examination, defendant asked Benzinger whether the negative MRI results were at least some evidence of no traumatic brain injury. She replied, "It doesn't correlate very well either way, no. It certainly didn't show an injury though" (Doc. 131, 36:7–14).Defendant asked, "[I]n your practice, 80% of the MRIs you see are clear, they don't show proof of traumatic brain injury?" Benzinger agreed. Defendant then proposed that another physician might see a different correlation. Benzinger responded that "it would depend on who the patients were in that population" (*id.*, 36:15–25).

In response to defendant's motion, plaintiff argues that the Court's ruling was tentative or conditional, and defendant waived the current objection by not renewing its challenge during trial. Plaintiff recalls that when ruling on the motion in limine, the Court stated it would entertain objections if Benzinger's testimony ventured beyond the scope of her treating role. So plaintiff concludes the ruling was tentative. It is true that when a court makes a tentative or conditional ruling before trial, "the adversely affected party must renew its objection at trial in order to preserve the issue for appeal." *Duran v. Town of Cicero, Ill.*, 2011 WL 3444353, at *12 (7th Cir. Aug. 9, 2011) (citing *Wilson v. Williams*, 182 F.3d 562, 565–66 (7th Cir. 1999)). Here, however, defendant asserts that Benzinger's testimony went beyond the scope of treatment when she discussed the lack of correlation between MRI results and incidence of brain damage. Although the motion is somewhat confusing, it appears defendant is circling back to the motion in limine. The Court's ruling with regard to Benzinger's correlation testimony was definitive, not tentative, so defendant was not required to renew its objection during trial to avoid waiver. *Wilson*, 182 F.3d at 567.

The waiver aside, the Court affirms its ruling on the motion in limine. Plaintiff was not required to provide an expert report because Benzinger was not "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). She examined plaintiff's MRI results in the course of his treatment and issued a report. The report stated there was no MRI evidence of

traumatic brain injury. She was called as a witness in this trial to explain the meaning of the MRI results and her report. In doing so, she testified that in her clinical practice about 80% of patients with brain damage appear normal on the MRI results. This was not testimony about the cause of an injury determined for the purpose of litigation, but is akin to the effects of an injury at the time of treatment. *See Banister v. Burton*, 636 F.3d 828, 831, 833 (7th Cir. 2011) (expert report not needed for treating physician who testified about effects of gunshot wound). An expert report was not required.

The objected-to testimony did not prejudice defendant anyway. A new trial is only required if an error was harmful, *Banister*, 636 F.3d at 833, and Garcia, Escobar, and Johnstone all offered the same opinion as Benzinger that MRI results do not correlate well with incidence of brain damage. Defendant's motion for a new trial based on Benzinger's testimony is **DENIED**.

## VI. MOTION FOR SET-OFF

Defendant moves for set-off (Doc. 147), alleging a FELA plaintiff is not entitled to recover as damages medical bills and expenses paid for by the defendant railroad, meaning defendant would be entitled to a set off in the amount of plaintiff's paid medical bills and expenses. Defendant further reserved the right to supplement this motion for set-off with an affidavit setting forth the amount of such bills and expenses. Plaintiff moved for an extension of time to respond to defendant's motion (Doc. 166), and this Court gave plaintiff until March 1, 2011, to respond (Doc. 169). Plaintiff never responded. Normally this

would mean defendant's motion would be granted, but because defendant never provided this Court with information of the alleged medical bills and expenses, this Court is unable to award any amount. Defendant's motion for set-off (Doc. 147) is therefore **DENIED**.

**VII. MOTION FOR INTEREST**

Plaintiff moved for prejudgment interest (Doc. 136), requesting both prejudgment and postjudgment interest. Defendant's response (Doc. 161) argues prejudgment interest is not available for FELA cases, but makes no response to the claim for postjudgment interest.

**A. Prejudgment Interest**

A plaintiff is not entitled to prejudgment interest in FELA cases. *Monessen Sw.Ry. Co. v. Morgan*, 486 U.S. 330, 336-39 (1988). *See also Payne v. Norfolk S.Ry. Co.*, 2010 WL 3979605 (N.D. Ill. 2010) ("It is well settled that a plaintiff is not entitled to prejudgment interest in FELA cases"). As the Supreme Court recognized, the "federal and state courts have held with virtual unanimity over more than seven decades that prejudgment interest is not available under the FELA." *Monessen*, 486 U.S.at 338. As such, plaintiff's request for prejudgment interest in this case is **DENIED**.

**B. Postjudgment Interest**

Postjudgment interest is governed by 28 U.S.C. § 1961. Interest "shall be allowed on any money judgment in a civil case rendered in a district court." *Id.* at § 1961(a). The purpose of postjudgment interest is not to punish the defendant,

but to encourage prompt payment and compensate the plaintiff for another party's use of the plaintiff's money.  *Overbeek v. Heimbecker*, 101 F.3d 1225, 1228 (7th Cir. 1996).  Postjudgment interest is calculated from the date of the entry of the judgment to the date of payment.  28 U.S.C. § 1961(a), (b).The appropriate date of judgment from which interest is calculated is the date of entry of the judgment, not the date of the verdict.  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990).  The federal interest rate for determining postjudgment interest is equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.  28 U.S.C. § 1961(a). Postjudgment interest is compounded annually.  *Id.* at § 1961(b).

Thus, plaintiff's motion for postjudgment interest is **GRANTED**.  The postjudgment interest on the $9 million net verdict shall be calculated from the date of the entry of the judgment, November 12, 2010 (Doc. 124), to the date of payment.  The rate to be applied is the weekly average one-year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.  In this case, that would be 0.22%, the rate published for Friday, November 5, 2011, the week prior to the entry of judgment on November 12, 2010.[7]  The interest is to be compounded annually.

---

[7]This rate was taken from http://www.federalreserve.gov/releases/h15/data.htm, chart FRB_H15[1], found under the "Treasury constant maturities," "Nominal," "1-year," "Weekly (Friday)."   The same rate can be found in a simplified chart from the United States District Court for the District of Utah at http://www.utd.uscourts.gov/documents/int2010.html.

# VIII. MOTION FOR COSTS

Plaintiff filed a motion for costs (Doc. 138) and motion for reimbursement of additional costs (Doc. 139), to which defendant objected (Doc. 150). Plaintiff moved for a stay on the ruling on the motions for costs (Doc. 163), pending a potential agreement between the parties as to payment of costs. A stay was granted (Doc. 164). Then plaintiff filed a memorandum regarding its motion for costs (Doc. 194), indicating which sums were still in dispute among the parties. Defendant filed a reply to the memorandum (Doc. 195), indicating plaintiff's representations in its memorandum were correct.

The following items are in dispute (explained in more detail later):

- D. $2,051.13 for stenographer and videographer deposition fees
- R. $160 for three witness fees
- V. $429.15 for trial transcripts
- W. $6,767.90 for twenty deposition transcripts (defendant only objects to $2,589 of that--five depositions)
- X. $1,775.00 for video depositions of seven people (defendant objects to video depositions of three people, which in actuality totals $1,250, but defendant only specifically asks that $850 be discounted)
- Y. $4,300 for "trial services" of Gore Perry
- Z. $1,518.20 for video depositions of three people
- BB. $2,805 for blow ups
- EE. $167.55 for trial photographs & exhibits

Federal Rule of Civil Procedure 54(d) provides that costs should be allowed to a prevailing party unless a federal statute, rule, or court order provides otherwise. The clerk may tax costs on 14 days' notice. *Id.* Not all trial expenses are taxable as costs; only those items authorized by law may be taxed as costs.

Local Rule 54.2. Costs shall be taxed in accordance with Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920. Local Rule 54.2. The following may be taxed as costs: fees of the clerk and marshal; fees for printed or electronically recorded transcripts necessarily obtained for use in the case; fees and disbursements for printing and witnesses; fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; and docket fees under 28 U.S.C. § 1923. 28 U.S.C. § 1920. Federal courts are free to pursue a case-by-case approach and to make their decisions on the basis of the circumstances and equities of each case. *See* 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2668 (3d ed. 1998); *Nobles v. Rural Cmty. Ins. Serv.*, 490 F. Supp. 2d 1196, 1201 (M.D. Ala. 2007) (citing Wright & Miller).The court's discretion embraces both allowing and disallowing all costs or only particular items. *See Testa v. Village of Munelein, Illinois*, 89 F.3d 443, 447 (7th Cir. 1996) (holding district court did not abuse its discretion in ordering each party to bear its own costs); *Nochowitz v. Ernst & Young*, 864 F. Supp. 59, 60-61 (N.D. Ill. 1994) (disallowing some costs). The burden is on the unsuccessful party to show circumstances that are sufficient to overcome the presumption in favor of the prevailing party. *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1235-36 (7th Cir. 1998).

**A. Deposition costs--transcripts, stenographer fees, video deposition fees**

Costs may be awarded for deposing a witness, even one who is not called at trial, so long as the deposition was necessary when taken. *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir. 1995). Incidental costs such as per diem and delivery charges by the court reporter, may also be taxed as a cost. *See id.* A district court may award costs of both video recording and steno-graphically transcribing the same deposition. *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 701 (7th Cir. 2008). In addition to being authorized by statute, a cost must be both reasonable and necessary to the litigation for a prevailing party to recover it. *Id.* at 702.

- **D. $2,051.13 for stenographer and videographer deposition fees**

Plaintiff requests an award of costs for videographer fees of $897 for the depositions of Cook, Turner, and Willoughby, plus copies of the original and one certified transcript of each of those depositions at a cost of $1,195.93. The total is $2,051.13. All three witnesses had information regarding where plaintiff fell. The video deposition of Willoughby was played at trial. This Court finds these depositions were reasonably necessary at the time they were taken, regardless of the fact that Cook and Turner ultimately testified live. For these reasons, the Court **GRANTS** plaintiff's motion for reimbursement of these costs.

- **W. $6,767.90 for twenty deposition transcripts (defendant only objects to $2,589 of that--five depositions)**

Plaintiff requests an award of costs for deposition transcripts of Dr. McMullin, (259.60), Dr. Escobar ($530.60), Dr. Adams ($358.75), Dr. Garcia

($409.50), Roberts (297.75), Anderson ($298.65), Schockley ($34.20), Hooagland ($114.05), Dr. Lemann ($621.05), Minnear, Anderson, Davis, Goedde and Yingling ($1,452.25), Dr. Nielson, Barton and Austin ($1,939), Dr. Meyer ($268.30), Snyder and Wells ($670.25). The sub-total is $7,253.95, less the expenses of condensed copies and exhibits, which brings the total to $6,767.90. Of that, defendant only objects to the deposition costs of Nielson, Barton, Austin, Snyder and Wells, which are $2,589. Since there is no objection to the remaining $3,978.90, that amount is **GRANTED**.

For the $2,589 for depositions of Nielson, Barton, Austin, Snyder and Wells, all five of these witnesses testified during their depositions in some capacity about plaintiff's rehabilitation and the coverage of certain types of treatment by plaintiff's healthcare plan, among other issues. This admissibility of this evidence was contested and not resolved until trial was under way. At the time the depositions were taken, however, they were reasonable. As such, the amount requested by plaintiff for these depositions is **GRANTED**.

- **X. $1,775.00 for video depositions of seven people (defendant objects to video depositions of three people, which in actuality totals $1,250, but defendant only specifically asks that $850 be discounted)**

Plaintiff requests an award of costs for video depositions of Dr. McMullin, Dr. Garcia, Roberts, Burden, Dr. Lemann, Snyder and Wells, totaling $1,775. Of this, defendant objects to the costs of Dr. Lehmann's deposition ($850) and Snyder and Wells ($400). The remaining $525 is not disputed, meaning that amount is GRANTED. As for the $1,250 for video depositions of Snyder and

Wells, the depositions themselves were reasonable at the time they were taken, as discussed above. Additionally, awarding the costs for both the paper transcript and the video recordings of these witnesses is reasonable; while juries do not favor depositions over live testimony, they do prefer video depositions over written transcripts only. There was a reasonable prospect that the video depositions of Snyder and Wells would be presented at trial instead of live testimony. As such, the remaining $1,250 requested by plaintiff is **GRANTED**.

- **Z. $1,518.20 for video depositions of three people**

Plaintiff requests an award of costs for the video depositions of Nielson, Barton and Austin for $1,518.20. For the same reasons discussed in connection with the video depositions of Snyder and Wells, this request is **GRANTED**.

**B. Witness fees--subpoenas**

- **R. $160 for three witness fees**

Plaintiff requests an award of costs for subpoenas for depositions of Burn, Tucker, and Hoover (two subpoenas), totaling $160. The award of costs for subpoenas is authorized by 28 U.S.C. § 1920, provided it was reasonable and necessary. *Little*, 514 F.3d at 702. Here, all three United Healthcare employees potentially had information regarding the control of plaintiff's medical treatment and ejectment from the mental health facility. As such, the subpoenas were reasonable and plaintiff's request for the $160 is **GRANTED**.

**C. Trial transcripts**

- **V. $429.15 for trial transcripts**

Plaintiff requests an award of costs for the trial transcripts for the opening statements ($54.40), and witnesses Michelle Vaughn, Ronnie Robbins, and Karen Smoot ($375.10), for a total claim of $429.50. A court may tax as costs the "fees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). This includes trial transcripts necessarily obtained for use in the case. *Majeske v. City of Chicago*, 218 F.3d 816,825 (7th Cir. 2000). The introduction of testimony from a transcript is not a prerequisite for finding that it was necessary. *Id.* While courts may not tax the costs of transcripts provided merely for the convenience of the requesting parties, a transcript used to record the court's oral rulings, to prepare memoranda, to prepare for direct and cross examinations, to draft post-trial briefs, and to respond to post-trial motions, the obtaining of the transcripts is necessary to the case. *Id.*

Here, plaintiff used the requested transcripts in preparation for the presentation of evidence at trial, cross examination, and in preparation for closing arguments. As such, the transcripts were necessarily obtained for use in the case, and plaintiff's motion for an award of costs for $429.15 in trial transcripts is **GRANTED**.

**D. Exemplifications--trial services, blow ups, trial photographs & exhibits**

"Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case" are taxable as costs under 28 U.S.C. § 1920(4). This provision enables a district court to allow

reimbursement for a variety of trial-connected expenses. To determine whether to award costs for exemplification, the court must decide whether the exemplification was necessarily obtained for use in this case. *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 428 (7th Cir. 2000) (citing 28 U.S.C. § 1920(4)). A court may consider"whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed. In other words, was the exemplification vital to the presentation of the information, or was it merely a convenience or, worse, an extravagance?" *Id.* at 428-29.

- **Y. $4,300 for "trial services" of Gore Perry**

Plaintiff requests an award of costs for the use of Gore Perry, a reporting and video company used to present exhibits, photographs, and edited videotaped deposition transcripts. The utilization of Gore Perry during the trial was necessary because they expedited the trial and permitted for easily showing the details of certain photographs. Plaintiff has reduced the claimed amount from $8,155 to $4,300, and the use of Gore Perry in this particular matter was more than mere convenience. Accordingly, plaintiff's request for $4,300 for Gore Perry's trial services is **GRANTED**.

- **BB. $2,805 for blow ups**

Plaintiff requests an award of costs for enlarged prints corresponding to numerous exhibits. Both parties utilized the exhibits and larger blow ups

throughout trial. They were necessary to the presentation of evidence, and as such, plaintiff's request for $2,805 for these blow ups is **GRANTED**.

- **EE. $167.55 for trial photographs & exhibits**

Plaintiff requests an award of costs for photographs increased in size from approximately 3x5 to 8.5x11 for use with the ELMO technology in the courtroom during trial. These were for exhibit 6 (photograph of Turner dismounting), exhibit 30 (daytime photograph of ballast), exhibit 31 (group exhibit with numerous photographs), and exhibit 33 (group exhibit of plaintiff's knee). All of these enlarged photographs were used during the trial, admitted into evidence, and were reasonably necessary to the presentation of evidence in this case. As such, plaintiff's request for $167.55 is **GRANTED**.

## IX. CONCLUSION

Defendant's motion for judgment as a matter of law or for a new trial (Docs. 143 & 145) is **DENIED**. Defendant's motions for leave to supplement and to exceed 5 pages (Docs. 182 & 183) are **GRANTED**. Plaintiff's motion to strike (Doc. 190) is **DENIED**. Defendant's motion for extension of time (Doc. 185) is **DENIED** as **MOOT**. Defendant's motion for set-off (Doc. 147) is **DENIED**. Plaintiff's motion for prejudgment interest (Doc. 136) is **GRANTED** in part and

**DENIED** in part; specifically the request for prejudgment interest is denied, and the request for postjudgment interest is granted. Plaintiff's motion for costs (Doc. 138) and motion for reimbursement of additional costs (Doc. 139) are **GRANTED**.

       **IT IS SO ORDERED.**

       Signed this 24th day of August, 2011.

David R. Herndon
2011.08.24 05:39:40
-05'00'

**Chief Judge**
**United States District Court**
